You know, coming from Will County, I've heard in other parts of the state that it's full of a lot of characters. This case really sort of proves that. Wally Vincus was a character. The man owned a strip club known as the Crazy Rock. He also owned a place called All World Storage. At some point, he befriends my client, Thomas Reese, and they sort of hit it off. My client owns what's known as a skid steer, which is a small bobcat type of construction equipment, and Reese stores it at All World Storage. At some point in time, Reese borrows some money from Vincus. There's a couple of promissory notes that are signed. My client testified that he repaid those and that he had more or less an arrangement with Vincus where he would keep his bobcat or skid steer at All World and let Vincus use it and he wouldn't pay storage for it. At some point, Vincus gets sick and he dies. And the next day, my client, apparently my client and Tammy Vincus, had some words at the hospital about this issue. And then the next day, my client goes to All World and he just picks it up, loads it up to his truck, and removes it. Almost immediately, Tammy Vincus and Mark Rohn, her boyfriend, who she basically had hired as a manager for her at All World, come to All World and two employees at All World call the police. They're there, and it's pretty clear that Tammy and Rohn and All World, they want the eventually, who gets involved. And he basically says, look, this is a civil matter. As far as I'm concerned, it belongs to Reese. He apparently owned it. And I can charge him with trespass because apparently he came on to All World property without that. But that's not what they want. They don't want him charged with trespass. They want the skid steer back. And the officer went on to well, if there happened to be the existence of a bill of sale that showed that instead of just loaning money and using the skid steer as collateral, if it was actually a sale document, that would be proof enough for the officer then to charge Reese with theft of the skid steer and he a bill of sale appears. And that's faxed to the officer. The officer then goes and arrests my client. And my client's sitting in jail and is arrested. And there's only one problem to the whole prosecution for my client of this skid steer. The transaction, which supposedly occurred, in 2005, but it's on a form, a legal form that's copyrighted 2006. So the whole fiasco comes unwound. They go back and they ask Mr. Rohn, like, well, how did this happen? And he ends up admitting that he forged the bill of sale, that it's a forged document. He ends up getting charged with it and gets convicted of that. So this ends up in litigation. And the question really is, is there a respondeat superior relationship between All World and Tammy Vincus and Mark Rohn? In the trial court, there was a lot of depositions that were taken of all parties. All World filed a motion for summary judgment. And it was really kind of, their motion was basically that here's the forged document. There's no respondeat superior. And the judge, the trial judge seemed to think that, well, you know, plaintiff, Mr. Schrock, you have Tammy Vincus, she's an owner. So what more do you need? And granted their motion. I submit that there's a lot of, that given the inferences and circumstances that we raise in this case, there's a lot of, there's a material issue of genuine thick. And you have to send this back to Waldo County. We've got to reverse the judge's decision and remand it for further proceedings. Is All World a closely held apparently thought she was the owner. As it turns out, I think that there was another sister that she was actually in 50, 50% ownership with. And I think that Vincus' estate was rather hotly litigated. And I think if we got down to the nuts and bolts of it, I think there was another person that made a claim for part of the estate. So if we look at it as of today, I think the truth would be that Tammy Vincus owns about 25% of it. At the time, her father died. She thought she was the owner. She stepped in and started acting like an owner and started doing everything like she owned the place. I mean, I guess from a practical sense, I'm assuming that you've got a judgment against Tammy for what, $175,000 that she doesn't have the assets to satisfy it. Yeah. I think that if we were to look at the docket in Will County, we would find there are multiple, multiple lawsuits against Tammy Vincus that are all have judgments that are unsatisfied. And my client, I mean, honestly, he's not going to be left without any type of recovery unless we can establish the agency relationship to all of them, is the practical reality of this. So the question of whether or not we can establish a respondent superior type of situation, there's three things that we need to show. We need to show that there's conduct of the agent, that they're empowered to perform. We need to show that the acts occurred, that there's a substantial relationship within their authorized time and space requirements. And we also have to show that the agent acted at the client's heart for a purpose to serve the master. I submit that if you look at this case and give the plaintiff all of the inferences that can be drawn, we've established all three of those. Before we go into that analysis, there's a couple things I want to sort of point out, and it's the frame that we have to look at this case at. And first of all, the bill of sale is a forged document. It really doesn't have legal significance to this case. And I think it's clear that it is a forged document, so the fact that Mr. Roan wrote it, indicating that it's written to Mr. Vincus, doesn't really aid in the question of the agency So I anticipate that counsel is going to argue that, well, hey, in the criminal prosecution, the state alleged that it was Tammy Vincus's property, not Allworld's property. But that was based on a forged document, which doesn't, again, doesn't get to the meat of the relationship here between Tammy Vincus, Roan, and Allworld. This is also not a case, we're not litigating in this case, the issue of who really had better title to this skid steer. That could have been a civil case that could have been done, but we're not here, we're not litigating that case either. We never got to that point. They didn't, they could have, Tammy Roan, Tammy Vincus, and Mark Roan, could have filed a civil suit, and that issue could have been litigated, but they went a different route. So we're not talking about that case here either. Bottom line is, Officer Slew, and I think he was from the auto theft unit, said that, hey, the skid steer belongs to Reece. And based on Reece's testimony, if you accept Reece's, and Reece, we have to accept his testimony, for purposes of a motion for summary judgment, he said that, yeah, I used it as collateral, but I paid him back. Now they're going to say that, well, there's no proof of that, there's no receipt or anything, but there is his testimony that he did in fact pay him back. And if you accept Reece's testimony, he says that he had this relationship where he let Vincus use it for all world purposes, he did several projects, he would move stuff around, there was an expansion project, he used it to remove snow, which shows an all world purpose to this. Given that, now we have two factors. The first one is conduct of the kind that's expected to perform. Well, Tammy, whether she's a 100% owner or a 25% owner, she's an owner. And she would be empowered to go and do whatever's necessary, if it's on normal 9 to 5 work hours, or even after, to go and get the documents together, to forward them on to the police, to send them off to get a piece of all that, she owns the manager. Also, there's no, it was sort of going on to the second point, did this occur substantially within the authorized time and space limitations? Well, what evidence is there of what the time and space limitations were for Mr. Rohn? There's no evidence that he had, that they said that he couldn't do work, he had to only do work for all world, you know, at the office, or only from 9 to 5. And we got to remember, this whole matter started with two all world employees, Vincus and Rohn, calling the police And what happened is, the officer tells them that, look, I'll charge them with trespass. It's like, no, they wanted more. They want to get the skid steer back. So they had to come up with the next step. And that next step that they did, I submit, is continues to be within the course and scope of their employment. And that gets to the third issue is, is this arguably an act done on behalf of all world? Well, let me ask you, what does a woman like Tammy Vincus, what is she really going to use a skid steer for? She's not going to use it around the home for gardening. She's not going to use it, you know, to do makeup. We're not talking about a piece of equipment for her hair. We're talking about a piece of construction equipment. The testimony was that Mr. Vincus had used this at all world. When they were complaining about, they didn't want just my client arrested. They want him arrested and charged with not trespass, but with theft. And the purpose of that is so that they would, that he would rather than go to jail, he'd give it back. That's what they wanted. They wanted this piece of equipment back. Well, the question is, is from whom did he steal it? I'm sorry? The question is, is assuming he stole it, from whom did he steal it? Well, I submit that the reality is, it's a piece of equipment that's set at all world. Mr. Vincus used it at all world. And Tammy, I think, you know, if you infer, she would want it as a piece of equipment to use at all world. All the testimony was that the transactions between your client and Walter Vincus individually and not with All World, Inc. Okay, but what does that have to do about Tammy Vincus's relationship with All World? Her relationship with All World is when she comes in and takes over as owner, she wants it back. Not for any individual purpose, but for the piece of equipment for all world purposes. You're right. There was a personal relationship and the transaction was between them, but we're here studying not my client's relationship with Vincus. We're studying Tammy and Roan's relationship to All World. So my point is, is that given that, the only reason I can see that they would want it would be to have it around to use at All World. I don't think Tammy Vincus wanted it individually either. He used it at All World. So that satisfies the third request, which is that it has to be at least ostensibly for the employer's purpose. Well, from your standpoint, all the statements don't necessarily have to agree with you. We need to find the material, question the material back. That's correct. And I cited the Pine case. And that's the case where I think is somewhat similar, where there's a mechanic and the place his employer had to, it appeared that GM wanted him to work and they wanted certified mechanics. So he signed up for a certified mechanics test that the at night. And then there's an accident where he'd obviously been drinking at 1030. So the inferences is that he went from the test, went to a bar, had some beer, and it was the employer said, you know, we don't allow people to drink on the job. And then the accident happens. And then the plaintiff is trying to get the employer to be found responding superior liable for this accident. And the appellate court in that case reversed a summary judgment saying that there's a question of fact here, that the plaintiff may be able to go to prove at trial that he was still within the course and scope of employment. I think that's sort of the same thing here. We know that they started at All World and it progressed in getting this piece of equipment back to All World is going to help All World. So given all those inferences that I think that if you if you lead those in our favor, I think that there's more than a question of fact that needs to be determined by the jury. And we ask that you reverse the remainders in this fact that will count. Thank you. All right. Thank you, Mr. Scott. Mr. Kostin. May it please the court, counsel. As counsel agrees, typically liability for tortious conduct rests on the actors. And there's an exception when an agent or an employee, they have to show that they're acting within the scope of their employment. And the three prongs for that are whether the employee was doing work that he was hired to do within the scope of his responsibilities. Secondly, did that conduct occur within the time and space of his employment? And thirdly, is there evidence that there was any purpose to serve the employer? And also, there's no evidence that it occurred within the time and space of the employment of Mark Rohn and Tammy Vinkes. You're saying they were working there at the time? Well, the skid steer was taken the day after Wally Vinkes died, allegedly during his funeral. And so as of April 1st, there's no evidence that Mark Rohn was employed by that time. Tammy hired him after she started taking over the business. On April 1st, Tammy was told that the skid steer had been taken and she went out there, but she had not been appointed executor, for example, of the estate yet, and there wasn't any transfer of ownership yet at that time the day after. So as of that day, there's no evidence that her employment started there. Mark Rohn testified that when he prepared the bill of sale, he was at home at the Vinkes estate, and he faxed it from the Vinkes estate. So there's no evidence that what he did happened within the time and space of his employment. But she testifies, and I know that you note that, she says, I think that that's the phone number from All World. And you say, well, there's no evidence of that, but isn't that, I mean, it's a question of fact whether or not, you know, that would come out at a trial, where this phone number, where it was actually faxed from, and isn't that something that, you know, they've been alleging this, and it's been foreclosed by the court, the trial court, and really these are questions that should be decided by a trier of fact, not at this stage of the game? Well, speculation doesn't create a question of fact, and it's clear that she's guessing if you look at that testimony in context. She said, well, gee, I thought All World's number was All World's, but it's speculation. Mark Rohn had personal knowledge because he did it, and he testified that I prepared it at home, at their house that they called the Vinkes estate, and that it was faxed from there. And then Officer Sloop testified that he went to pick up the original, and it was at the house, and he got it from Tammy. So that is, I guess, really on Tammy's part as to the phone number, and, you know, I think that that would be thin, somebody's memory of a telephone number, compared to Mark Rohn's personal knowledge. But Mark Rohn has some credibility issues, doesn't he? Wouldn't that tend to lessen... Mark Rohn admitted that he, I'm not aware of credibility issues around him, but he was convicted. The guy who was home was at her house at that time, wasn't it, weren't they living together? Yes. So, I mean, here's a guy who forged a bill of sale. I mean, isn't there, isn't that an issue in a trier-of-facts mind? Well, he admitted in his deposition that he forged it. He was convicted of some... Well, he was charged, and I think convicted by that time, hadn't he? Correct, Your Honor, I think he... I mean, I didn't have anything to lose by telling the truth, then, but... Well, he, again, admitted in the deposition he had done it, and he said, I don't know what purpose he would have to say, I did it at the house, if he really did it at work. Because then, if he did it at work, it would help him, I think, because then I'll be able to buy one. Well, that's a great argument to the jury, but the fact is, if you were to try this case, you'd be able to probably get the conviction in, which would increase his credibility, and you can make that argument all day that, well, he had no reason to lie about this because he told the truth about this, but your opposition can say, this guy lied, the truth would help, and he previously lied, and you can decide whether you want to believe him or not, right? Correct. The jury could make that decision. I mean, that argument could be made. I don't believe there's enough evidence of time and space, but let's move on to purpose to benefit all world. Regarding ownership, the promissory note is clearly between Vincus and Tom Rizzi. Tammy testified, it was my machinery and I wanted it back. She testified that her father had loaned money, the skid steer was collateral, and that the money had not been paid back. The promissory note says that if Rizzi doesn't pay it back within six months, Wally Vincus becomes the owner. Ross Gunther at All World testified that Wally owned it, and the police complaint against Rizzi said that it was owned by Tammy Vincus. Tammy believed that she owned it. So there's no evidence that it was owned by All World. But in the same vein that you earlier said she hadn't been given any authority to run All World, she also hadn't been given any of her father's property at that point. I mean, these are all issues. Whether she owned it or not is very unclear. I mean, I guess she hoped she was going to be a beneficiary of her father's estate, but at the time that she placed this phone call that it was stolen during his funeral, I don't know that there had been any... Well, I mean, presumably she could call if somebody was stealing property that belonged to her father. I mean, I don't think that it's out of bounds for her to call the police if someone stole something that she believes belonged to her father. But the only evidence, what she believed is she owned it, whether she's right or wrong. And the promissory note is between Walter Vincus and Rizzi, and there's no evidence at all that All World owned it. I think there's a possibility that she maybe conflated her own ownership versus the corporate ownership. She thought that both of them were relatively equivalent, and she could say it's mine. But there's no evidence that the corporation or the employee at All World, Ross Gunther, said Wally told him it belonged to Wally. The promissory note that those are the papers that we have, so it's between them. Tammy always testified it was my equipment and I wanted to get it back. Mark Rohn told the police it's my girlfriend's equipment and I wanted to get it back for her. That's what Tammy told the police. So there's no evidence that whatever their purposes, if they overstepped by taking the property too early, and even if Tammy was incorrect that she didn't own it, because we know now that the residuary went to her, but her sister is to take cap based on rulings by this court. There's no evidence that Tammy or Mark Rohn believed it belonged to All World or that they were trying to help All World. They thought they were trying to get a piece of equipment that they consistently testified belonged to Tammy. That's what she said at the time to the police. And the equipment was bought for $14,000, so they felt it was not a worthless piece of equipment at least. And counsel said, well, what else would she do with it but use it at All World? Well, she could have sold it and gotten that the restitution was $9,000 that Mr. Rohn had to pay, so presumably it's worth $9,000. So she could have easily have sold it. Anyway, there's no evidence that what counsel said, well, the only thing she could have done was use it at All World, but there's no evidence of that. And so isn't the bigger question is that during all of this time, whether she had the right to or not, she's holding herself out as running All World, as being the recipient of her father's estate, and that they're all intermingled. I don't think there's any question that Walter Rinkes owned or ran All World. I mean, it seems that there's a lot of question of fact. Are they the same entity? Is it a closely held corporation? I mean, all of these things to me seem to be issues that would be best resolved at a different stage of a proceeding. But there's no evidence that she represented the police, that she was making the report for All World, that she was representing All World. What she told them over and over, even according to the police, is that she owned it and that she wanted it back because it was hers. And again, we might disagree with her legal analysis on that, but there isn't any evidence in the record that she was acting because she wanted to use it at All World or because she believed All World owned it. She always said it was her dad's. The promissory note would show, assuming that that wasn't paid back, that it would go to Walter Rinkes. And there just isn't any evidence that she intended to use it there or wanted to benefit All World. Okay? Thank you. Thank you very much. Mr. Schrock? There is a response to a question that Tammy admitted that she was an agent of All World. And the other question that I would point out is when Tammy is saying that, yeah, I want that back, what hat is she wearing? Is she wearing the hat as an owner of All World? Again, I think that she is. And again, I think that the inferences that we can make is she didn't want this back for any personal reason. She wanted it back so she could have it at All World. I mean, yeah, you could sell it, but they had utilities. This piece of equipment had utility for All World. Mr. Rinkes had used it at All World to shovel snow, stuff like that. And I submit that the inference is that she wanted it for the same reason, to use at All World. Given all that, I think there's a lot of, there is genuine issues and material fact, and we ask that you remain and send back to McCowney. Thank you. Thank you. Thank you both for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short date. And now we'll take a short recess for a panel.